## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ATLAS DATA PRIVACY CORPORATION, *et al.*,

                    *Plaintiffs,*

v.

JOY ROCKWELL ENTERPRISES, INC., *et al.*,

                    *Defendants.*

Case No.: 1:24-cv-04389

Civil Action

---

## JOY ROCKWELL ENTERPRISES, INC.'S OPPOSITION TO PLAINTIFFS' 12(b)(6) MOTION TO DISMISS COUNTERCLAIMS

---

**GREENSPOON MARDER LLP**
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com

*Attorneys for Defendant Joy Rockwell Enterprises, Inc.*

## **TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT.........................................................................1

II.  FACTUAL BACKGROUND ...........................................................................2

    A. PostcardMania's Business and Privacy Practices ...................................2

    B. Atlas' Scheme to Target PCM and Holiday Email Attack .......................2

    C. Atlas' Obstruction, Unauthorized Access, and Misrepresentations..........3

        1. Obstruction .........................................................................3

        2. Unauthorized Access and Misrepresentations by Atlas .....................5

    D. Impact on PCM Systems, Business Operations, Resulting Harm..............7

III. LEGAL STANDARD ....................................................................................8

IV.  LEGAL ARGUMENT....................................................................................8

    A. PCM Sufficiently Pled a Claim for Relief under CFAA...........................8

        1. PCM Sufficiently Pled Atlas Caused Damage/Loss over $5,000.......13

        2. PCM Sufficiently Pled Violations of Multiple CFAA Subsections....14

        3. Atlas Misreads the Law, Mischaracterizes PCM's Allegations, and Invites Premature Fact-Finding ................................................16

    B. PCM Sufficiently Pled a Claim for Relief under CROA .........................19

        1. PCM Adequately Alleges the First CROA Element...........................21

        2. PCM Adequately Alleges the Second CROA Element ......................22

        3. Atlas is Wrong on the Law and the Facts for CROA.........................23

    C. PCM Sufficiently Pled a Claim for Relief for Tortious Interference.......24

        1. Reasonable Expectation of Economic Benefit Plausibly Pled...........25

        2. Malicious Interference by Atlas is Sufficiently Pled .........................26

        3. Resulting Losses is Plausibly Pled....................................................27

    D. PCM Sufficiently Pled Civil Fraud ......................................................28

1.  Atlas made Material Misrepresentations..............................................31

2.  Atlas Knew Representations were False and Intended Reliance ........34

3.  PCM Reasonably Relied and Sustained Damages as a Result ...........36

E.  PCM Sufficiently Pled a Claim for Relief for Civil Conspiracy .............37

V.  CONCLUSION ..................................................................................................39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Advanced Fluid Sys., Inc. v. Huber*,
  28 F. Supp. 3d 306 (M.D. Pa. 2014), *aff'd, 958* F.3d 168
  (3d Cir. 2020) ............................................................................. 9, 13, 16

*Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*,
  121 F. Supp. 2d 1255 (N.D. Iowa 2000) ................................. 10, 14, 17

*Andritz, Inc. v. S. Maint. Contractor, LLC*,
  No. 3:08-CV-44(CDL), 2009 WL 10674137 (M.D. Ga. Feb. 4, 2009) ................ 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................... 8, 18

*Austar Int'l Ltd. v. AustarPharma LLC*,
  425 F. Supp. 3d 336 (D.N.J. 2019) ...................................................... 27

*Auto. Res. Mgmt. LLC v. Favo*,
  No. CV 21-2630 (SRC), 2022 WL 1080991 (D.N.J. Apr. 11, 2022) ................ 20

*Automated Salvage Transp., Inc. v. NV Koninkliijke KNP BT*,
  106 F. Supp. 2d. 606 (D.N.J. 1999) ...................................................... 31

*Avaya Inc., RP v. Telecom Labs, Inc.*,
  838 F.3d 354 (3d Cir. 2016) ..................................................... passim

*B & B Microscopes v. Armogida*,
  532 F. Supp. 2d 744 (W.D. Pa. 2007) ...................................... 9, 12, 14

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ....................................................................... 33

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................... 8, 18

*Brooks v. AM Resorts, LLC*,
  954 F. Supp. 2d 331 (E.D. Pa. 2013) ......................................... 11, 18

*Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*,
   441 F. Supp. 3d 23 (D.N.J. 2020) ................................................................. passim

*Castrol Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993) ....................................................................... 32, 34

*Christie v. Nat'l Inst. for Newman Stud.*,
   No. CV 16-6572 (FLW), 2019 WL 1916204 (D.N.J. Apr. 30, 2019) ................. 9

*Cline v. Reetz-Laiolo*,
   329 F. Supp. 3d 1000 (N.D. Cal. 2018) ...................................................... 11, 18

*Craftmatic Sec. Litig. v. Kraftsow*,
   890 F.2d 628 (3d Cir. 1989) ....................................................................... 8, 34

*Dello Russo v. Nagel*,
   358 N.J. Super. 254 (App. Div. 2003) ............................................................ 26

*Ewing v. Cumberland Cnty.*,
   152 F. Supp. 3d 269 (D.N.J. 2015) ............................................................... 38

*Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*,
   191 N.J. 460 (2007) ..................................................................................... 20

*Farmers Ins. Exch. v. Auto Club Grp.*,
   823 F. Supp. 2d 847 (N.D. Ill. 2011) ............................................... 10, 11, 14, 18

*Farris v. Cnty. of Camden*,
   61 F. Supp. 2d 307 (D.N.J. 1999) ................................................................ 38

*Ferring Pharms. Inc. v. Watson Pharms., Inc.*,
   No. 2:12-CV-05824 (WJM), 2014 WL 12634303 (D.N.J. Aug. 4, 2014) ........... 20

*Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*,
   810 F.3d 1075 (7th Cir. 2016) ................................................................. 13, 15

*Fineman v. Armstrong World Indus.*,
   980 F.2d 171 (3d Cir. 1992) ..................................................................... 25, 26

*Frederico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007) ...............................................................34

*Freeman v. Giuliani*,
    No. CV 21-3354 (BAH), 2022 WL 16551323 (D.D.C. Oct. 31, 2022)..............39

*Gaetano v. Gilead Sciences, Inc.*,
    529 F. Supp. 3d 333 (D.N.J. 2021)............................................... 17, 22

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*,
    286 F.2d 631 (3d Cir. 1961) ...............................................................18

*Gross  v. Coloplast Corp.,*
    434  F.  Supp.  3d 245 (E.D.  Pa.  2020) ...........................................8, 36

*Hauptmann v. Wilentz*,
    570 F.Supp. 351 (D.N.J. 1983).............................................................17

*Heartland Payment Sys., LLC v. Carr*,
    No. 318CV09764BRMDEA, 2021 WL 302918 (D.N.J. Jan. 29, 2021)..............25

*Hillsborough Rare Coins, LLC v. ADT LLC*,
    No. CV 16-916 (MLC), 2017 WL 1731695 (D.N.J. May 2, 2017) ....................38

*In re Adams Golf, Inc. Securities Litigation*,
    381 F.3d 267 (3d Cir. 2004) ......................................................... 16, 22

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ..............................................................34

*Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*,
    679 F. Supp. 3d 53 (D.N.J. 2023)........................................................26

*Kaufman v. i-Stat Corp.*,
    165 N.J. 94 (2000) ..................................................................... passim

*Lamorte Burns & Co. v. Walters*,
    167 N.J. 285 (2001) .............................................................. 25, 26, 27

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004) ...............................................................34

*MaxLite, Inc. v. ATG Elecs., Inc.*,
  193 F. Supp. 3d 371 (D.N.J. 2016)........................................................38

*MaxLite, Inc. v. ATG Elecs., Inc.*,
  No. CV 15-01116, 2024 WL 4764685 (D.N.J. Nov. 13, 2024) ........................38

*Modis, Inc. v. Bardelli*,
  531 F.Supp.2d 314 (D. Conn. 2008) ....................................................9

*Mortellite v. Novartis Crop Prot., Inc.*,
  460 F.3d 483 (3d Cir. 2006) .............................................................30

*New Jersey Carpenters & the Trs. Thereof v. Tishman Const.*
*Corp of New Jersey*,
  760 F.3d 297 (3d Cir. 2014) ..............................................................8

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .......................................................................34

*P.C. of Yonkers, Inc. v. Celebrations!*,
  No. 04-4554, 2007 WL 708978 (D.N.J. Mar. 5, 2007) ......................................20

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*,
  428 F.3d 504 (3d Cir. 2005) ...............................................................9

*Philip Morris USA, Inc. v. Lee*,
  481 F. Supp. 2d 742 (W.D. Tex. 2006) ...................................................38

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...............................................................8

*Printing Mart-Morristown v. Sharp Electronics Corp.*,
  116. N.J. 739 (1989) ....................................................... 24, 25, 26, 28

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*,
  648 F.3d 295 (6th Cir. 2011) ............................................. 10, 14, 16, 17

*ResMan, LLC v. Karya Prop. Mgmt., LLC*,
  No. 4:19-CV-00402, 2019 WL 4394564 (E.D. Tex. Sept. 13, 2019)........... 13, 15

*Rolo v. City Inv. Co. Liquidating Trust,*
   155 F.3d 644 (3d. Cir. 1998) ...............................................................................29

*Ryanair DAC v. Booking Holdings Inc.,*
   636 F. Supp. 3d 490 (D. Del. 2022) .................................................... 9, 13, 15, 16

*Ryanair DAC v. Booking Holdings Inc.,*
   No. CV 20-1191-WCB, 2024 WL 3732498.................................................. 13, 15

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,*
   119 F. Supp. 2d 1121 (W.D. Wash. 2000) .................................................... 12, 15

*SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.,*
   No. CV 20-2970, 2021 WL 1226411 (E.D. La. Apr. 1, 2021) ..................... 12, 13

*St. Johns Vein Ctr., Inc. v. StreamlineMD LLC,*
   347 F. Supp. 3d 1047 (M.D. Fla. 2018) .......................................... 11, 12, 14, 18

*Teva Pharms. USA, Inc. v. Sandhu,*
   291 F. Supp. 3d 659 (E.D. Pa. 2018).................................................... 9, 13, 15, 16

*Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.,*
   292 F.3d 384 (3d. Cir. 2002) ...............................................................................18

*United States v. Carlson,*
   209 F. App'x 181 (3d Cir. 2006).................................................... 10, 14, 16, 17

*United States v. Drew,*
   27 F. App'x 164 (4th Cir. 2001)............................................................ 11, 14, 17

*United States v. Lowson,*
   No. CRIM. 10-114 KSH, 2010 WL 9552416 (D.N.J. Oct. 12, 2010) .......... 13, 15

*Universal Health Services, Inc. v. U.S.,*
   579 U.S. 176 (2016) .................................................................................... 29, 33

*Van Dam Egg Co. v. Allendale Farms, Inc.,*
   199 N.J. Super. 453 (N.J. Super. A.D. 1985)................................................ 31, 37

*Varacallo v. Massachusetts Mut. Life Ins. Co.,*
   332 N.J. Super. 31 (App. Div. 2000)............................................................ 30, 37

*Velop, Inc. v. Kaplan*,
   301 N.J. Super. 32 (App. Div. 1997)...................................................................27

*Victaulic Co. v. Tieman*,
   499 F.3d 227 (3d Cir. 2007) ............................................................... 17, 22

## Statutes

18 U.S.C. § 1030 ................................................................................ *passim*

N.J.S.A. 2A:38A-2 .................................................................................22

N.J.S.A. 2A:38A-1 .................................................................................21

N.J.S.A. 2A:38A-3 ......................................................................... 20, 21, 23

## Rules

Fed. R. Civ. P. 8 .....................................................................................1

Fed. R. Civ. P. 9 ................................................................................ *passim*

Fed. R. Civ. P. 12 ......................................................................... 2, 8, 17

## I.    <u>PRELIMINARY STATEMENT</u>

Atlas Data Privacy Corporation's ("Atlas") motion to dismiss is built on a false narrative that ignores the extraordinary nature of its own conduct and the detailed, well-pled allegations in the counterclaims. Altas orchestrated a massive, coordinated, and intentional electronic bombardment – nearly 48,000 emails sent when Joy Rockwell Enterprises, Inc. d/b/a PostcardMania PCM LLC ("PCM") was closed for New Years – designed to overwhelm PCM's systems, disrupt its operations, and manufacture thousands of artificial claims for Atlas. That unprecedented voluminous attack was not a lawful exercise of rights under Daniel's Law aimed at safety; it was a calculated cyber-attack executed for Atlas' profit.

The counterclaims plausibly allege – with specificity far surpassing *Fed. R. Civ. P.* 8's requirements – that Atlas: (1) intentionally accessed PCM computer systems without authorization; (2) recklessly interfered with PCM's customer relationships and business; (3) made knowing misrepresentations to advance its scheme; (4) conspired with others to carry it out; and (5) harmed PCM as a result. Atlas' attempt to recast these actions as "ordinary pre litigation conduct" is contradicted by the pleadings, the timing, the scale, and Atlas' own documents.

PCM's allegations must be accepted as true with all reasonable inferences in PCM's favor and easily satisfy the requisite plausibility standard. Atlas deliberately flooded PCM's servers, obstructed compliance, and manufactured a "critical mass"

of invalid requests for its own profit. Atlas' motion – premised on selective readings, fact disputes, and premature defenses – fails under *Fed. R. Civ. P.* 12(b)(6).

## II.    FACTUAL BACKGROUND

### A.    PostcardMania's Business and Privacy Practices

PCM provides business-to-business ("B2B") marketing services, primarily designing personalized postcards and providing mailing services to small businesses. *See* CC[1] at ¶ 1. PCM is <u>not</u> a people search company or a data broker. Its services are accessible only to customers who consent to PCM's Terms of Service and Privacy Policy. *Id.* at ¶¶ 1, 53-57. PCM's dedicated privacy/opt-out system through its publicly listed email (privacy@postcardmania.com) accepts individual and bulk submissions. *Id.* at ¶ 25.

### B.    Atlas' Scheme to Target PCM and Holiday Email Attack

Atlas developed a business model designed to exploit recent amendments to New Jersey's Daniel's Law by recruiting tens of thousands of purported "covered persons" ("Assignors"), obtaining alleged rights to Assignors' claims, and directing Assignors to target a pre-selected list of companies, including PCM. *Id.* at ¶¶ 13-16. Atlas represented itself as removing personal data from "data broker websites," yet knowingly included PCM despite PCM <u>not</u> being a data broker nor offering people

---

[1] "CC" refers to PCM's Counterclaims set forth in its Amended Answer, Affirmative Defenses, Counterclaims, and Demand for Jury Trial (Doc. No. 68).

search services. *Id.* at ¶¶ 15-16. Atlas failed to determine if PCM possessed any Protected Information for Assignors, ignored PCM's business and privacy practices, and misled Assignors as to material facts related to PCM. *Id.* at ¶¶ 23-24.

Over six months, Atlas amassed nearly 20,000 Assignors but withheld all nondisclosure requests for them until Atlas launched a coordinated attack between December 30, 2023 and January 5, 2024. While PCM was closed for the holiday, Atlas sent about 48,000 auto-generated emails to PCM's primary sales email address. *Id.* at ¶¶ 19-20, 24, 27-33. This was not PCM's privacy email; it was a sales account that typically receives only forty emails per day. *Id.* at ¶ 39.

Court-ordered production revealed that Atlas' launch about 48,000 emails (for less than ½ as many Assignors) which contained duplications, mismatched addresses, multiple submissions per individual, and other redundancies designed to artificially inflate the volume of emails. *Id.* at ¶¶ 28-33. Atlas' emails were Atlas-created, autogenerated, invalid, not sent by Covered Persons, and lacked individualized information required for verification. *Id.* at ¶¶ 13, 17-18, 21-23.

**C.    Atlas' Obstruction, Unauthorized Access, and Misrepresentations**

**1.    *Obstruction***

Despite substantial disruptions from Atlas' holiday onslaught, PCM attempted in good faith to obtain the information necessary to evaluate and address any valid requests – as the spam attack resulted in a necessary security threat

response, which blocked the email domain, thus preventing receipt of an unknown number of emails. *Id.* at ¶¶ 24-25, 43. PCM contacted Atlas at least *five* times trying to get the full details of the alleged requests as same were not received – twice by phone and three times by email – seeking identification of the Assignors, the information they wanted redacted, and information required to process any legitimate requests. Atlas refused to provide the information. *Id.* at ¶¶ 43, 46.

Counsel for PCM, later engaged, again reached out to Atlas for the Assignor information. Regardless of validity or applicability, PCM's standard practice is to remove personal data for *anyone* through its pre-existing opt-out process; but, to do so, it obviously needed to receive the information first. Atlas then proposed a Confidentiality Order ("CO") as a precondition to providing the very requests it alleged to have sent to PCM in its Complaint, which CO would only provide Assignors' information to counsel and would have **barred PCM** from reviewing same, thus preventing any possible compliance. Atlas later ignored PCM's proposed CO revisions to allow PCM view the information Atlas wanted redacted. *Id.* at ¶¶ 47-48. Despite months of attempts to work with Atlas, PCM was ignored.

Atlas only produced the lists of purported Assignors' "requests" after ordered to do so by this Court on May 6, 2024, following PCM's request for judicial assistance. *Id.* at ¶ 49. These actions show that Atlas did <u>not</u> seek compliance, it sought to manufacture a high-volume monetary claims system for itself. *Id.* at ¶ 50.

4

2. *Unauthorized Access and Misrepresentations by Atlas*

Atlas was not authorized to access PCM's systems through its massive email spam attack – such access was, on its face, reckless. Atlas is not a PCM customer, and not authorized to access PCM's computers, platforms, or data. *Id.* at ¶¶ 53-58. Atlas accessed PCM's protected systems without authorization and recklessly through misrepresentations and in violation of PCM's terms of use. *Id.* at ¶¶ 89-94. Atlas misrepresented PCM's business, the validity of its requests, the covered-person status of Assignors, and its intent to facilitate lawful compliance. *Id.* at ¶¶ 95-100. Atlas, in concert with others, conspired to unlawfully access PCM's computers and data, interfere with PCM's business, and took overt steps to carry out the plan. *Id.* at ¶¶ 102-107. Atlas' contention that the Counterclaims are devoid of particularized facts is belied by a review of same, for example, PCM details:

(i) *Misrepresentations Concerning PCM and Its Business*: Atlas mislabeled PCM as a "data broker" that publishes personal information online (*id.* at ¶¶ 16, 95); made false statements that PCM possessed Protected Information to redact, i.e., home addresses or unpublished numbers (*id.* at ¶¶ 22-23, 97); and wrongfully included PCM as a target on a preset list of alleged "data brokers," thereby misleading Assignors into believing PCM published their data. *Id.* at ¶¶ 16, 95-97.

(ii) *Misrepresentations Regarding Assignors and Covered Person Status*: Atlas made false representations that the emails were sent by Covered Persons, when same were created, autogenerated, and sent by Atlas (*id.* at ¶¶ 17-18, 35-36, 95); failed to verify Covered Person status as Atlas did not confirm Assignor eligibility yet represented them as such by the tens of thousands (*id.* at ¶¶ 21, 37, 97); falsely claimed that the email requests were valid when Atlas submitted generic, incomplete, non-individualized requests incapable of validation (*id.* at ¶¶ 17-18, 37,

95); and artificially inflated request volume through Atlas' near simultaneous submission of multiple emails per Assignor to increase claim counts. *Id.* at ¶¶ 28, 31, 97.

(iii) *Misrepresentations Concerning Email Requests*: Atlas made false assertions that the emails it sent contained Protected Information when Atlas did not verify that the request contained Protected Information – nor if PCM had any such information to redact (*id.* at ¶¶ 17, 23, 97); misrepresented that the requests complied with Daniel's Law when Atlas' self-crafted, automated, duplicative, and incomplete unverified emails were not lawful submissions (*id.* at ¶¶ 17-18, 28, 95-97); misrepresented proper delivery and "receipt," in its mass emails to PCM's sales inbox instead of PCM's designated privacy address (*id.* at ¶¶ 24-25, 97); and made misrepresentations through timing by Atlas' withholding of requests for months and delivery of ~ 48,000 emails during PCM's holiday closure. *Id.* at ¶¶ 24, 26-27, 32-34, 97.

(iv) *Misrepresentations to Assignors*: Atlas made false statements about PCM's business and privacy practices by misleading Assignors into believing PCM published their personal data (*id.* at ¶¶ 23, 97); falsely representing that PCM held Assignors' Protected Information when with no factual basis for PCM being a risk to them (*id.* at ¶¶ 16, 22-23, 97); and made false promises of prompt enforcement while intentionally withholding requests to maximize volume and reduce likelihood of compliance – thereby decreasing Assignor protection in favor of increasing Atlas' profit. *Id.* at ¶¶ 19-20, 96-97.

(v) *Misrepresentations Regarding Atlas' Intent and Purpose*: Atlas made false claims of acting to protect Covered Persons through a purported safety mission to mask a coordinated holiday email attack designed to generate litigation (*id.* at ¶¶ 13, 20, 26, 34, 50); made false claims of cooperation while refusing to provide PCM the required information until compelled by Court order (*id.* at ¶¶ 43-50, 96); and feigned cooperation through a proposed CO that would have prevented PCM from viewing the requests. *Id.* at ¶¶ 47-48.

(vi) *Misrepresentations Used to Obtain Unauthorized Access*: Atlas or its agents misrepresented their identity or authorization as PCM customers or authorized users to gain system access (*id.* at ¶¶ 58–60, 89–94); made false representations of authority by holding themselves out as

permitted to interact with PCM's systems and data (*id.* at ¶¶ 53-58, 89-91); and made false statements intended to induce PCM to rely on them for access, processing, and response. *Id.* at ¶¶ 92-93.

(vii)  <u>*Misrepresentations of Requests Volume and Authenticity*</u>: Atlas made false representations of ~48,000 unique requests when Atlas artificially inflated the volume through automation and duplication (*id.* at ¶¶ 17-18, 28-32, 97); and false representations of tens of thousands of plaintiffs when Lists produced under Court order show duplication, contradictions, and manufactured volume.  *Id.* at ¶¶ 28, 31, 97.

## D.    Impact on PCM Systems, Business Operations, Resulting Harm

Atlas' coordinated attack crippled PCM's operations. PCM's primary sales email inbox increased from about forty emails a day to thousands, a ***4,700% increase overnight***, while PCM was closed for New Years. *Id.* at ¶¶ 32-34, 39-40. The surge disabled PCM's primary sales lead channel, overwhelmed its system, blocked legitimate customer communications, and resulted in significant operational and economic harm. *Id.* at ¶¶ 40-41. In response, PCM was forced to divert technicians, programmers, and employees for a substantial amount of time/expense. *Id.* at ¶ 44.

As a result of Atlas' actions, PCM suffered significant harm, including, diversion of more than 80 hours of programmer time, disruption of daily business operations (*id.* at ¶ 61), impairment of ability to serve existing and prospective customers (*id.* at ¶¶ 40-41, 51), damage to business relationships and economic expectancy (*id.* at ¶¶ 78-85), costs in responding to and mitigating the cyberattack (*id.* at ¶¶ 61-62, 68-69), and interruption of interstate commercial activity (*id.* at ¶ 52). PCM's losses far exceed $5,000 during a one-year period. *Id.* at ¶ 69.

7

## III.   LEGAL STANDARD

On a Rule 12(b)(6) motion, the Court accepts well-pled facts as true and draws reasonable inferences in the non-movant's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *New Jersey Carpenters & the Trs. Thereof v. Tishman Const. Corp of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014). Pleadings survive if they state a claim that is plausible and contain facts to "suggest the required elements" or "raise a reasonable expectation that discovery will reveal evidence" supporting the elements. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 55 (2007); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Courts do not weigh evidence or demand proof at this stage. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

Fraud claims must satisfy *Fed. R. Civ. P.* 9(b) by pleading the who, what, when, where, and how, but courts apply the rule with practicality, permitting allegations based on information uniquely in the other party's possession to be pled on belief. *Gross v. Coloplast Corp.*, 434 F. Supp. 3d 245, 249 (E.D. Pa. 2020); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).

## IV.   LEGAL ARGUMENT

### A.    PCM Sufficiently Pled a Claim for Relief under CFAA

The Federal Computer Fraud and Abuse Act ("CFAA") 18 U.S.C.A. § 1030 claim requires "(1) damage or loss [] during any 1-year period . . . aggregating at least $5,000 in value; (2) caused by; (3) violation of one of the substantive provisions

of §§ 1030(a) or (b)." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326

(M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) (internal quotes/cites omitted)

(alteration in original); *see* 18 U.S.C. § 1030(g); *Christie v. Nat'l Inst. for Newman

Stud.*, No. CV 16-6572 (FLW), 2019 WL 1916204, at *4 (D.N.J. Apr. 30, 2019).

"The CFAA prohibits seven types of computer crimes involving unauthorized access

to computers (or access in excess of authorization) which results in obtaining

information from or damaging the computer." *Huber*, 28 F. Supp. 3d at 326.

Relevant here, the CFAA precludes:[2]

> (1) Intentional access to a computer without authorization or exceeding authorized access,[3] and thereby obtains "information from a protected computer."[4] 18 U.S.C. § 1030(a)(2)(C).
>
> (2) Access to a protected computer or exceeding authorized access "knowingly and with intent to

---

[2] Civil actions under CFAA are not limited to violations of subsection (a)(5). *See P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*, 428 F.3d 504, 511 (3d Cir. 2005); *Andritz, Inc. v. S. Maint. Contractor, LLC*, No. 3:08-CV-44(CDL), 2009 WL 10674137, at *4 (M.D. Ga. Feb. 4, 2009).

[3] "Exceeds authorized access" means authorized access used "to obtain or alter information in the computer [to which] the accesser is not entitled[.]" 18 U.S.C.§ 1030(e)(6). "[T]he statute imposes liability on one who acts beyond the scope of her access authority." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 668 (E.D. Pa. 2018). Where a username and password are required to access a website, access obtained in violation of the terms of service exceeds authorization. *Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 509 (D. Del. 2022).

[4] A "protected computer" is "used in or affect[s] interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B). "A computer is 'protected' if it is connected to the Internet." *Teva Pharms.*, 291 F. Supp. 3d at 668; *see also B & B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 757 (W.D. Pa. 2007); *Modis, Inc. v. Bardelli*, 531 F.Supp.2d 314 (D. Conn. 2008). PCM's computers qualify.

defraud," and "by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." *Id.* at (a)(4).

(3)    "[K]nowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." *Id.* at (a)(5)(A).

"[A] plaintiff must show *either* damage or loss." *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (internal quotes/cites omitted) (emphasis in original); *see also* 18 U.S.C. § 1030(g). "Damage" is "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). A "barrage of calls and e-mails," which "diminish[ a party's] ability to use its systems and data because they prevented [the party] from receiving at least some calls and accessing or sending at least some e-mails" constitutes damage under a transmission claim. *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011). Such "diminished-ability concept" has been endorsed by numerous courts. *See id.* at 302; *Am. Online, Inc. v. Nat'l Health Care Disc., Inc.,* 121 F. Supp. 2d 1255, 1274 (N.D. Iowa 2000) ("[W]hen a large volume of [unsolicited bulk e-mail] causes slowdowns or diminishes the capacity of [the party] to serve its customers, an 'impairment' has occurred to the 'availability' of [the party's] 'system.'"). Indeed, in *United States v. Carlson*, 209 F. App'x 181

10

(3d Cir. 2006), the defendant was convicted for "sending thousands of e-mails to one e-mail address, which would clog the address" and thereby caused damage. *See also United States v. Drew*, 27 F. App'x 164, 164 (4th Cir. 2001) (CFAA "clearly criminalizes [] bombarding [] with massive numbers of e-mail messages.").

"Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). A party "can satisfy the CFAA's definition of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA." *Farmers Ins.*, 823 F. Supp. 2d at 854; *see also Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (Loss includes "the cost of remedial measures taken to investigate or repair the damage to the computer" or "lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance."); *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1049 (N.D. Cal. 2018) ("The cost of investigating unauthorized access and securing a computer network constitutes a 'loss' under the statute."). Losses asserted by the claiming party need not be robust to survive dismissal. *See St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1062 (M.D.

11

Fla. 2018) (denying dismissal where plaintiff alleged "lost time and effort needed to take subsequent remedial measures" to prevent future breaches, "other expenses" responding to the unauthorized access and "assessing the scope of intrusion," disruption in the day-to-day operations, and devotion of "substantial resources to managing its" data). *St. Johns Vein Ctr.* string cites nine cases wherein allegations from identifying, investigating, or ascertaining the extent of unauthorized access, resecuring servers, or conducting damage assessments were all sufficient to withstand dismissal. *Id.*; *see also B & B Microscopes*, 532 F. Supp. 2d at 758 (damage assessment and lost revenue due to service interruption sufficient).

There are two main differences between 18 U.S.C. § 1030(a)(2) and (a)(4) – first, "subsection (a)(4), unlike (a)(2), requires that a person act with the '*specific intent to defraud*'" and second, "a person violates subsection (a)(2) by merely obtaining '*information*,' while (a)(4) requires that the person obtain '*anything of value.*'" *SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. CV 20-2970, 2021 WL 1226411, at *4 (E.D. La. Apr. 1, 2021) (internal cites omitted) (emphasis in original). Fraud under CFAA means "'simply . . . wrongdoing' and does not require 'proof of the common law elements of fraud.'" *Id.* at *5 (quoting *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000)) (alteration in original). Defraud means "'wronging one in his property rights by dishonest methods or schemes.'" *Id.* (quoting *Shurgard Storage*

12

*Centers*, 119 F. Supp. 2d at 1126); *see also Ryanair*, No. CV 20-1191-WCB, 2024 WL 3732498, at *21 (Courts look for "evidence of deceit."); *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (defraud means intent to deceive or cheat). "[C]ourts have found that a plaintiff states a claim under § 1030(a)(4) when it alleges that the defendant participated in dishonest methods to obtain the plaintiff's secret information." *SMH Enters*, No. CV 20-2970, 2021 WL 1226411   at *6 (internal quotes omitted); *see also United States v. Lowson*, No. CRIM. 10-114 KSH, 2010 WL 9552416, at *7-8 (D.N.J. Oct. 12, 2010) (finding intent to defraud properly pled where defendant accessed site in contravention of terms of service); *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2019 WL 4394564, at *3 (E.D. Tex. Sept. 13, 2019) (plaintiff sufficiently pled defendant provided database access to third party in violation of terms of service).

A "person who did not directly access the computer may still be liable under the CFAA if he 'directs, encourages, or induces' someone else to access a computer that he himself is unauthorized to access." *Teva Pharms.*, 291 F. Supp. 3d at 671 (cite omitted); *see also Huber*, 28 F. Supp. 3d at 328 (sufficient allegations of conspiracy to gain access); *Ryanair*, 636 F. Supp. 3d at 499.

1.   *PCM Sufficiently Pled Atlas Caused Damage/Loss over $5,000*

Damage under 18 U.S.C. § 1030(e)(8) includes any impairment to the availability of a system. PCM alleges Atlas orchestrated a holiday-timed surge of

~48,000 auto-generated emails into PCM's primary sales inbox (which ordinarily receives ~40 emails per day), producing a 4,700% overnight increase in email traffic that disabled PCM's sales lead channel, blocked legitimate customer communications, and overwhelmed systems – i.e., the precise "impairment of availability" multiple courts recognize as "damage." *See Pulte Homes*, 648 F.3d at 301-02 (mass calls/emails diminished ability to use systems); *Am. Online*, 121 F. Supp. 2d at 1274 (bulk email causing slowdowns impairs "availability"); *Carlson*, 209 F. App'x 181 (thousands of emails clogging address constitutes damage); *Drew*, 27 F. App'x at 164 (bombardment with e-mail messages creates damage).

Loss includes reasonable costs to respond, investigate and restore systems, and consequential damages from service interruption. 18 U.S.C. § 1030(e)(11). PCM pleads diversion of 80+ hours of programmer time as well as incident response, security adjustments, and operational disruption affecting interstate commerce – with aggregate losses well above $5,000. Courts hold that employee time, investigation, mitigation, and restoration costs suffice at the pleading stage. *See Farmers Ins.*, 823 F. Supp. at 852-54; *St. Johns Vein Ctr.*, 347 F. Supp. 3d at 1062; *B & B Microscopes*, 532 F. Supp. 2d at 758.

As such, PCM plausibly alleges "damage" (capacity impairment) and "loss" (response and restoration costs) far exceeding the $5,000 threshold in one year.

      2.    *PCM Sufficiently Pled Violations of Multiple CFAA Subsections*

Only one violation is required to state a CFAA claim, yet PCM pled multiple subsections violations and with the required plausibility. First, PCM sufficiently pled violations of § 1030(a)(2)(C): Unauthorized Access to Obtain Information. Atlas – not a customer and barred by PCM's Terms of Service from automated/disruptive access – intentionally accessed PCM's protected computers by funneling ~48,000 auto-generated emails into an internal business account and, through that access, obtained information (including system behavior, delivery telemetry, and leverage for manufactured claims). "[O]btaining information" is construed broadly. *See Ryanair,* 636 F. Supp. 3d at 509 (terms-of-use-violative access sufficient); *Teva Pharms.*, 291 F. Supp. 3d at 668 (exceeding access scope sufficient).

Next, PCM pled a violation of § 1030(a)(4): Unauthorized Access with Intent to Defraud and Obtain Value. PCM alleges a deceit-driven scheme: mislabeling PCM as a "data broker," misrepresenting covered-person status and requests validity, withholding requests to obstruct compliance, duplicating/inflating volume, and engineering a "critical mass" launched during holiday closures to extract high statutory-damage value, thus defrauding. "Defraud" means dishonest methods/schemes; "value" is broadly interpreted. *See Shurgard*, 119 F. Supp. 2d at 1126; *Fidlar Techs.*, 810 F.3d at 1079; *Lowson*, 2010 WL 9552416, at *7-8; *ResMan*, 2019 WL 4394564, at *3; *Ryanair*, 2024 WL 3732498, at *21.

Further, PCM pled facts for violations of § 1030(a)(5)(A): Knowing Transmission Causing Damage. Atlas knowingly transmitted ~48,000 emails during a holiday closure, intending to overwhelm PCM's systems, which caused system impairment (blocked/disabled communications). Mass digital bombardment is actionable. *See Pulte Homes*, 648 F.3d at 301-02; *Carlson*, 209 F. App'x 181.

Finally, PCM pled violations of § 1030(b): Conspiracy/Attempt to Gain Access. Atlas coordinated with others, recruited tens of thousands of Assignors, auto-generated duplicative requests, used unauthorized means to access, and took overt acts to execute the plan – adequate for conspiracy under this section. *See Teva Pharms.*, 291 F. Supp. 3d at 671; *Huber*, 28 F. Supp. 3d at 328; *Ryanair*, 636 F. Supp. 3d at 499.

### 3.  *Atlas Misreads the Law, Mischaracterizes PCM's Allegations, and Invites Premature Fact-Finding*

Atlas' Omnibus Motion (filed in the DarkOwl action) telegraphs the same defenses here: that bulk Daniel's Law emails were "ordinary pre-litigation conduct," that PCM's "damage" is conclusory, that costs are not cognizable "loss," and that alternative, benign explanations defeat plausibility. Each defense fails. The question at this stage is plausibility of pleadings, not possible defenses to same. Defenses cannot justify dismissal. The Third Circuit has clearly stated that "an affirmative defense may not be used to dismiss a [] complaint." *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 277 (3d Cir. 2004). This rule reflects the fundamental

principle that courts "will not rely on an affirmative defense . . . to trigger dismissal of a complaint under Rule 12(b)(6)." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007). The rationale is straightforward: on a motion to dismiss for failure to state a claim, "all the well-pleaded material factual allegations of the complaint are to be taken as true, and the complaint is to be read in the light most favorable to plaintiff." *Hauptmann v. Wilentz*, 570 F.Supp. 351, 364 (D.N.J. 1983). Because affirmative defenses "generally depend on extrinsic facts," courts must "tread warily, dismissing under Rule 12(b)(6) only when the plaintiff has effectively pled itself out of court." *Gaetano v. Gilead Sciences, Inc.*, 529 F. Supp. 3d 333, 348 (D.N.J. 2021). Each of Atlas' defenses are inapplicable here.

*"Ordinary pre-litigation communications" Defense:* Atlas recasts a 48,000-email surge sent to the wrong inbox during a holiday closure with duplications, mismatched entries, and obstruction of validation as normal communications. PCM alleges the opposite: the timing, scale, duplication, and misdirection were engineered to impair PCM's systems and manufacture claims—the very conduct courts have condemned as "email bombardment" under CFAA. *See Pulte Homes*, 648 F.3d at 301; *Am. Online,* 121 F. Supp. 2d 1274; *Carlson*, 209 F. App'x 181; *Drew*, 27 F. App'x at 164. PCM's normal email traffic increasing from 40 a day, to nearly 10,000 a day, is far from "ordinary" communications.

*"No 'damage'; no 'loss' ≥ $5,000" Defense*: Atlas argues PCM's damage/loss are conclusory. Not so. PCM pled concrete system-availability impairment (blocked/disabled sales inbox) and response costs (80+ hours, restoration/mitigation, business interruption) that courts repeatedly recognize as "damage" and "loss" under § 1030(e)(8), (e)(11). *See id.; Farmers Ins.*, 823 F. Supp. 2d at 854; *Brooks*, 954 F. Supp. 2d at 338; *Cline*, 329 F. Supp. 3d at 1049 *St. Johns*, 347 F. Supp. 3d at 1062. No forensic bill of particulars is required.

*"Alternative explanations defeat plausibility" Defense:* Atlas speculates there are benign explanations (e.g., volume reflected real senders; emails couldn't harm a sophisticated company; any access was permitted). *Iqbal/Twombly* do not require disproval of alternative hypothesis. PCM need only plead a plausible one – here, a detailed narrative with dates, volumes, system impacts, and Atlas obstructive acts. Competing explanations are classic fact disputes, not dismissal grounds.

*"Assignee status" Defense:* Atlas disingenuously suggests its appearance "as assignee"[5] immunizes it from tort liability for its own conduct (recruitment, auto-generation, timing, duplication, inbox targeting, obstruction). Assignee status

---

[5] Atlas filed suit and took actions giving rise to counterclaims. Rule 13 allows counterclaims. *See Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d. Cir. 2002) (counterclaims proper where there is "a logical relationship" to conduct; "logical relationship has been viewed liberally[]"); *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961).

does not bar counterclaims for Atlas' independent torts and Atlas cites no authority to the contrary. Atlas' assignee argument deserves short shrift.

*CROA ≈ CFAA Defense*: Atlas argues the New Jersey CROA claims fail and, *ipso facto*, the federal CFAA claims fail. Not true and not here. The statutes are different. For example, unlike CROA, CFAA expressly defines "damage" and "loss" to include system-availability impairment and incident-response costs and provides a private civil remedy with a $5,000 loss threshold that PCM has plausibly pled.

In sum, PCM clears the plausibility bar. Mass, intentional transmissions to a non-privacy sales inbox during closure; duplications; obstruction of validation; unauthorized access and knowing transmission causing damage evince liability under the CFAA. Impairment of the availability of core systems (blocked customer communications; disabled lead channel) created damage. Necessity of 80+ hours of programmers, restoration, mitigation, and business interruption caused loss well over $5,000. Atlas engaged in a deception-based scheme to manufacture litigation value with the intent to defraud and obtain value. Atlas coordinated execution with others and automated tools shows conspiracy. PCM pled detailed, non-conclusory facts that, taken as true, state claims under 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(A), and (b).

**B.    PCM Sufficiently Pled a Claim for Relief under CROA**

To state a claim under New Jersey Computer Related Offenses Act ("CROA"), *N.J.S.A.* 2A:38A-3, a party must allege: (1) at least one of the statute's purposeful or knowing unauthorized acts, and (2) resulting damage to business or property. *Id.* at (a)-(e); *Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*, 191 N.J. 460, 468 (2007); *P.C. of Yonkers, Inc. v. Celebrations!*, No. 04-4554, 2007 WL 708978, at *8 (D.N.J. Mar. 5, 2007). *N.J.S.A.* 2A:38A-3[6] states:

> A person or enterprise damaged in business or property as a result of ***any of the following actions*** may sue . . . :
>
> a. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destruction of any data, database, computer program, computer software ***or*** computer equipment . . . ;
>
> b. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destroying of a computer, computer system or computer network;
>
> c. The purposeful or knowing, and unauthorized ***accessing or attempt to access*** any computer, computer system or computer network;
>
> d. The purposeful or knowing, and unauthorized altering, accessing, . . . a financial instrument; ***or***
>
> e. The purposeful or knowing accessing and ***reckless*** altering, damaging, destroying ***or*** obtaining of any data,

---

[6] Atlas narrowing CROA to "anti-hacking" is incorrect. CROA prohibits actions enumerated five subsections. *See Ferring Pharms. Inc. v. Watson Pharms., Inc.*, No. 2:12-CV-05824 (WJM), 2014 WL 12634303, at *6 (D.N.J. Aug. 4, 2014) (denying dismissal where defendant accessed a restricted webcast by evading password); *Auto. Res. Mgmt. LLC v. Favo*, No. CV 21-2630 (SRC), 2022 WL 1080991, at *3 (D.N.J. Apr. 11, 2022)(CROA prohibited accessing work email post-termination).

data base, computer, computer program, computer
software, computer equipment, computer system or
computer network.

[(emphasis added).]

1.    *PCM Adequately Alleges the First CROA Element*

Atlas acted "purposefully or knowingly" and without authorization and/or
recklessly, violating CROA § (a)-(c) and (e). Under CROA, "access" includes
"instruct[ing], ***communicat[ing] with***, stor[ing] data in, retriev[ing] data from, or
otherwise us[ing] any resources of a computer, computer system, or computer
network." *N.J.S.A.* 2A:38A-1(a) (emphasis added). Courts recognize "access"
includes *communication-based* intrusions. *Atlas Data Corp. v. REIPRO, LLC*, Dkt.
No. MRS-L-231-24 (Feb. 21, 2025) (Purcaro Cert., **Exhibit A**).

Here, Atlas engaged in unauthorized communication with PCM's systems by
transmitting nearly 48,000 spam, auto-generated emails to the wrong inbox over a
holiday period causing a 4,700% spike in normal email traffic. PCM's system
recognized this as a security threat and reacted. Such massive spam attack is exactly
the type of access intrusion CROA prohibits under §§ 2A:38A-3(a), (b), (c), and (e).

Atlas deliberately flooded PCM's computers after spending months collecting
~20,000 Assignors and withholding their purported "requests" until Atlas
aggregated a critical mass for its attack. Atlas transmitted ~48,000 auto-generated
emails to PCM during the 2023-2024 New Year's holiday, at a rate of about ~7,000

21

per day from Dec. 30th to Jan. 5th. Multiple emails per Assignor with various combinations of addresses and numbers were designed to artificially inflate email volume. Atlas sent these emails to PCM's sales inbox, not to PCM's established opt-out pathways. PCM plainly describes "purposeful or knowing unauthorized" and/or "reckless" accessing, taking, altering, or damaging. The attack was timed and designed to damage PCM's systems while PCM was closed for the holiday.

Atlas gained or attempted to gain access by unauthorized or fraudulent means. Atlas is not a customer and has no authorization to access PCM's system. Atlas accessed PCM's platform or data by fraudulent means and in violation of Terms of Service (i.e., hacking and/or using an unauthorized third-party account). Atlas improperly accessing PCM's systems by circumventing PCM's Terms is sufficient to satisfy pleading requirements here, particularly when accepted as true.[7]

### 2. *PCM Adequately Alleges the Second CROA Element*

PCM sufficiently pleads damage to its business and property. CROA expressly recognizes that "property or services, including the use of computer time" are compensable and that value is measured by fair market value or the cost of generating, obtaining, or storing data. *N.J.S.A.* § 2A:38A-2.

---

[7] Fact-intensive disputes cannot be resolved on a 12(b)(6) motion. *In re Adams Golf*, 381 F.3d at 277; *Victaulic Co.*, 499 F.3d at 234; *Gaetano*, 529 F. Supp. 3d at 348.

Atlas' attack directly disrupted PCM's business operations, overwhelmed PCM's primary sales email, and caused "disruption of use" as a result. These allegations are sufficient to plead damages. PCM was forced to address the cyberattack and divert resources to handle and respond to the deluge, and take action to prevent further harm.[8] Such allegations go beyond minimal pleading threshold.

Nearly identical conduct by Atlas, i.e., allegations of a mass-email cyberattack, has been held sufficient to plead business damage. Indeed, it was foreseeable that sending tens of thousands of emails in a compressed timeframe could disable a system, impede operations, and disrupt a company's ability to serve customers – satisfying § 2A:38A-3(e). *Atlas Data Corp. v. REIPRO, LLC*, Order at 21. The same logic applies here. Atlas overwhelmed PCM system, triggered security measures, and diverted resources – clear, cognizable CROA business damage.

3.    *Atlas is Wrong on the Law and the Facts for CROA*

Atlas ignores PCM's detailed facts.  Instead, Atlas claims PCM alleges only the "appearance" of a cyberattack and no concrete damage. Not so. PCM pleads specific, non-conclusory facts showing intentional, unauthorized access and resulting in business harm: Nearly 48,000 auto-generated emails**,** sent at ~7,000/day,

---

[8] PCM incurred substantial business disruption, interference, and measurable damages as a result. The attack consumed significant employee time, including over 80 hours for one programmer. PCM incurred additional losses of employee time, resources, and revenue; suffered business interruption; and lost the ability to respond to customers. PCM had to limit NJ business to prevent further harm.  All cognizable.

deliberately timed during holiday closure and directed to PCM's sales inbox instead of its opt-out channel. A 47,000% traffic spike, domain blocking, and clogged sales pipeline disabling system use and preventing PCM from conducting business.

Atlas claims that no damage or taking is alleged, both misstating the requirements under CROA's five sections and ignoring that "access" is established through communications as pled. Atlas mistakenly imposes a damage-to-computer measure here, when same is not required under CROA and further ignores the business damage pled by PCM, as detailed above. Further, as previously described, Atlas' suggestion that the emails were "ordinary" is contradicted the facts pled. Atlas' claim that no facts show it knew harm was likely similarly ignores the deliberate scheme alleged in detail and obvious inferences required in PCM's favor.

In sum, Atlas' Omnibus motion fails here because PCM pleads particularized facts showing purposeful, unauthorized, reckless conduct under CROA's broad "access" rubric – well beyond the conclusory allegations.

### C.    PCM Sufficiently Pled a Claim for Relief for Tortious Interference

The elements for tortious interference are: (1) reasonable expectation of economic benefit or a contract; (2) lost due to malicious interference, and (3) damages as a result. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016); *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116. N.J. 739,

750–52 (1989); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir. 1992). PCM sufficiently alleged facts in support of each element of this claim.

        1.    *Reasonable Expectation of Economic Benefit Plausibly Pled*

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling, or occupation, free from undue influence or molestation. Not only does the law protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectations of economic advantage." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 305 (2001) (internal cites/quotes omitted). A protectable right must be pled, but identification of specific customers lost is not required at the pleading stage. *Id.*; *see also Heartland Payment Sys., LLC v. Carr*, No. 318CV09764BRMDEA, 2021 WL 302918, at \*7 (D.N.J. Jan. 29, 2021) ("[P]laintiff does not need to allege specific prospective customers or contracts to show a reasonable expectation of prospective economic benefit.") (internal quotes omitted). A party need only allege enough facts to show a protective right (a prospective economic or contractual relationship) giving rise to some "reasonable expectation of economic advantage." *Printing Mart.*, 116. N.J. at 751. Prospective economic relationship is defined broadly, including "even the voluntary conferring of commercial benefits in recognition of a moral obligation" or "any other relations leading to potentially profitable contracts."

*Fineman*, 980 F.2d at 195 (internal quotes/cites); *see also Printing Mart*, 116 N.J. at 751-753 (reasonable expectation in ongoing and expected sales to the public).

PCM is a B2B postcard company that generally gets about forty sales emails per day, has contracts with its clients, Terms of Service and Privacy Policies, and it provides mostly personalized postcard designs and mailing to small businesses. It had a reasonable expectation of continuing its relationships and business with current and perspective customers. PCM sufficiently pled its "right to [its] business, calling, or occupation, free from undue influence or molestation" as required for this element. *Lamorte Burns*, 167 N.J. at 305*; Printing Mart*, 116. N.J. at 751.

### 2. *Malicious Interference by Atlas is Sufficiently Pled*

"[M]alicious interference—requires only the intentional doing of a wrongful act without justification or excuse." *Avaya Inc.*, 838 F.3d at 383 (internal quotes/cites omitted). "Wrongful conduct [is] always viewed in the specific context . . . . It is conduct that would not be sanctioned by the rules of the game." *Id.* (internal quotes/cites omitted). "Malice is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 111 (D.N.J. 2023) (internal quotes/cites omitted). Here, "malice is not used in the literal sense requiring ill will . . . . Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Dello Russo*

*v. Nagel*, 358 N.J. Super. 254, 269 (App. Div. 2003) (internal quotes/cites omitted). The requisite intent may be "the taking of improper action with knowledge that interference will probably result." *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49 (App. Div. 1997). "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes[.]" *Lamorte* Burns, 167 N.J. at 307. Allegations that Atlas "acted out of [its] own self interest to enrich [itself] at the expense of [defendant] are sufficient assertions of intent and malice." *Austar Int'l Ltd. v. AustarPharma LLC,* 425 F. Supp. 3d 336, 359 (D.N.J. 2019).

As detailed above, Atlas purposefully engaged in a fraudulent scheme to self-profit off Daniel's Law, and at the expense of Covered Persons and PCM. Such self-interested conduct, i.e., holding back Assignors requests and launching its attack in a manner designed to frustrate compliance and interfere with PCM's business gives rise to an inference of malice. Similarly, Atlas' misrepresentations and deceptive practices, obstruction, violations of terms, sidestepping of dedicated opt-out processes, targeting the sales email, and inflating volume, support malice inferences.

### 3.    *Resulting Losses is Plausibly Pled*

For "loss and causation, there must be proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Avaya Inc.,* 838 F.3d at 383. "[I]t is sufficient that plaintiff prove facts which, in themselves or by the

inferences . . . drawn therefrom, would support a finding that, except for the tortious interference by the defendant with the plaintiff's business . . . , plaintiff would have consummated the sale and made a profit." *Id.*; *see also Printing Mart*, 116. N.J. 739.

PCM pled foreseeable losses caused by Atlas' interference. Atlas' coordinated attack crippled PCM's operations, disabled use, overwhelmed systems, and blocked customer communications. PCM's forced diversion of resources, disruption of business operations, impairment ability to serve customers, interruption of interstate commercial activity, and actions to prevent further harm caused business and revenue losses, which would not have occurred but for Atlas' malicious interference.

### D.    PCM Sufficiently Pled Civil Fraud

Fraud requires: (1) misrepresentation of a material fact; (2) knowledge of its falsity; (3) intention of reliance; (4) reasonable reliance; and (5) resulting damages." *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000) (internal cites/quotes omitted). *Fed. R. Civ. P.* 9(b) "imposes a heightened pleading requirement for allegations of fraud" requiring "that in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 35 (D.N.J. 2020) (internal cites/quotes omitted). "The [party] need not, however, plead the date, place or time of the fraud, so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations[.]" *Id.* at 35-36;

*see also Rolo v. City Inv. Co. Liquidating Trust,* 155 F.3d 644, 658 (3d. Cir. 1998). The pleading must provide notice of the "precise misconduct" giving rise to the fraud charge "to prevent false or unsubstantiated charges." *Caspersen*, 441 F. Supp. 3d at 35 (internal cites/quotes omitted). Courts "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Caspersen*, 441 F. Supp. 3d at 36. Particularity of action is required, but mental elements may be inferred and alleged generally. *Id.* at 35.

A material fact has "a natural tendency to influence, or be capable of influencing, [a decision]." *Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 182 (2016). It is one "a reasonable man would attach importance to . . . in determining his choice [or] if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not." *Id.* at 193.

The knowledge element, "scienter," calls upon a party to "allege facts giving rise to a strong inference of either reckless or conscious behavior." *Caspersen*, 441 F. Supp. 3d at 39 (internal cites/quotes omitted). "Rule 9(b) expressly provides that [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Pleading circumstantial grounds for such knowledge is sufficient to meet the Rule 9(b) standard." *Id.* (internal quotes/cites omitted) (alteration in original). Mental state can be inferred, which inference need not be irrefutable, i.e., a "smoking

gun" or even the most plausible. *Id.* at 40. "The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*

Reliance is a mental state afforded inferences under *Fed. R. Civ. P.* 9. The intention that the receiving party rely on the misstatement and resultant reliance are intertwined. Reliance may be direct or indirect reliance. "The presumption or inference of reliance and causation, where omissions of material fact are common . . . extended in the context of both common law and statutory fraud." *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000).

"[I]ndirect reliance allows a plaintiff to maintain a fraud action based upon a statement the plaintiff heard not from the party that defrauded him or her but from that party's agent or from someone to whom the party communicated the false statement with the intention that the [plaintiff] hear it, rely on it, and act to his or her detriment." *Mortellite v. Novartis Crop Prot., Inc.*, 460 F.3d 483, 492 (3d Cir. 2006) (internal cites/quotes omitted.) Indirect reliance occurs when the actor makes a misrepresentation to a third party with the intention that it be communicated to and influence the plaintiff. *Kaufman*, 165 N.J. at 111.[9]

---

[9] "Indirect reliance remains . . . an element of a claim of fraud. If a party to a transaction makes a false statement to another party, intending or knowing that the other party . . . will hear it and rely on it, and the second party . . . hears the substance of the misrepresentation, by means however attenuated, and considers the actual content of that misrepresentation when making the decision to complete the

Whether one relied on misrepresentation, and if that reliance was reasonable, is a question of fact for the jury. *Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 453, 458 (N.J. Super. A.D. 1985); *Automated Salvage Transp., Inc. v. NV Koninkliijke KNP BT*, 106 F. Supp. 2d. 606, 625-26 (D.N.J. 1999); *Caspersen*, 441 F. Supp. 3d at 40-41. Resultant damages need not be pled specifically – it is sufficient to allege harm due to fraud. *See Avaya Inc.*, 838 F.3d at 388 (damages inferred where actions reduced profits, although by an uncertain amount).

1.    *Atlas made Material Misrepresentations*

Atlas, as the speaker and architect of the scheme, recruited Assignors, created, generated, and sent mass emails to a preset list it created, and communicated with PCM through the "@atlasmail.com" domain. Atlas' misrepresentations include:

(1)    Mischaracterizing PCM as a "data broker" publishing personal information online and claiming it possessed Protected Information;

(2)    Representing that tens of thousands of emails were valid "Covered Person" requests sent by the individuals;

(3)    Asserting proper "requests" while sending duplicative, incomplete emails to the sales inbox instead of PCM's designated privacy channel;

(4)    Touting a compliance, safety mission and prompt enforcement, yet delaying notices for months to blast ~48,000 holiday-timed emails; and

(5)    Misrepresenting authorization to obtain/interact with PCM's systems.

---

transaction, [that] established indirect reliance to support a fraud claim." *Kaufman*, 165 N.J. at 111.

These are concrete assertions not vague puffery. *See Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993).

False communications were transmitted December 30, 2023-January 5, 2024, with continuous mass emailing while PCM was closed. *See* CC at ¶¶ 32-34 (timing/closure), 27-33 (volume and cadence). Additional misrepresentations occurred *before* the blast (recruitment, preset target list; *id* at ¶¶ 13-16, 19-21) and *after* it (refusals and DCO gambit; *id.* at ¶¶ 43-50). The material misrepresentations were made in emails from @atlasmail.com to info@postcardmania.com on Atlas' website in Atlas preset target lists (*id.* at ¶¶ 15-16, 24-33, 35, 49-50) and same were made to Assignors and to PCM (via sales inbox not PCM's privacy email), itself a key particularized fact demonstrating mis-delivery and deception. *Id.* at ¶¶ 24-25.

PCM pleads detailed falsity and context as to each of Atlas' misrepresentations. PCM is a B2B postcard marketing company with no people-search nor data-broker function, and its services are available only to customers abiding by Terms of Service/Privacy Policy. The "requests" Atlas sent were generic, autogenerated, duplicative emails not from Covered Persons, without individualized data for verification, and to the wrong email – contrary to PCM's public opt-out process (including bulk csv/xls). Atlas' malintent is demonstrated by manufactured volume as the Court-ordered lists showed duplicative entries, mismatched addresses/phones, and multiple emails per individual to artificially

inflate counts (e.g., separate emails for multiple addresses and phone numbers). Further, PCM details Altas' withholding/timing designed to frustrate compliance as Atlas stockpiled names for months and then timed a 48,000-email blast during holiday closure, all inconsistent with Atlas' professed safety mission. Atlas (not a PCM customer) misrepresented authorization/identity to interact with PCM systems/data thereby violating PCM's terms.

These misrepresentations were material and outcome determinative. Among other things, these facts go to a reasonable Assignor's decision to sign-up with Atlas and agree to its preselection of PCM as well as PCM's reaction to the spam attack, and whether to allow access – core, outcome-determinative issues for PCM's operations. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (materiality standard); *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016). Representations about what PCM does, who it is, if it possessed protected information, if it had received valid opt-out requests, and what Atlas would be doing and how, for example, are quintessentially material facts to Atlas' overall scheme.

PCM identifies who (Atlas), what (false data-broker and "valid request" assertions, false authorization, and compliance claims), when (Dec. 30, 2023–Jan. 5, 2024, plus the antecedent recruitment and subsequent obstruction), where/how (AtlasMail domain; Atlas' website and list of targets, mis-delivery to PCM's sales inbox; court-ordered lists confirming duplication), and why false/material (PCM's

actual business model; non-Covered-Person, generic, duplicative requests; timing designed to frustrate compliance; unauthorized access; substantial operational/economic harm). These allegations satisfy Rule 9(b). *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997); *Craftmatic*, 890 F.2d at 645; *Castrol*, 987 F.2d at 945; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-89 (2015).

2.    *Atlas Knew Representations were False and Intended Reliance*

Scienter is satisfied where the pleading alleges facts giving rise to a "strong inference of either reckless or conscious behavior." *Caspersen*, 441 F. Supp. 3d at 39 (internal quotes omitted). Rule 9(b) expressly permits mental-state allegations to be made generally, so long as they are supported by circumstantial indicia of knowledge. *Id.* at 35-36. Here, PCM alleges far more than bare assertions, it describes a coordinated, months-long plan in which Atlas knowingly fabricated the essential components of its narrative, including: (a) who PCM is; (b) whether its Assignors were Covered Persons; and (c) whether the tens of thousands of autogenerated emails constituted valid "requests."

Atlas knew PCM was not a data broker and did not publish protected information yet falsely represented to Assignors that PCM is a "data broker" publishing "Protected Information" online. Atlas had full access to PCM's

public-facing website, Terms and Privacy Policy – which demonstrate, among other things, that PCM is a B2B business, not a data-broker providing on-line "people searches" – yet Atlas placed PCM on its preset target list nonetheless.

Atlas knew its tens of thousands of emails were not individualized requests. Atlas created generic, autogenerated emails completely devoid of individual information and Atlas sent them, not the Assignors. Atlas intentionally stockpiled these requests for months, waiting to launch a coordinated mass email attack underscoring Atlas' knowledge that the emails were not *bona fide* requests.

Atlas knew that many of its Assignors were not verified Covered Persons, it failed to confirm Covered Person status, failed to confirm PCM had any Protected Information, and even failed to verify that its own target list had any factual basis connecting PCM to the Assignors. This deliberate disregard for statutory predicates supports scienter under *Caspersen*, which recognizes that intentional blindness or reckless indifference may satisfy the knowledge requirement. Court-ordered lists further confirm Atlas knew of falsity as same revealed massive duplication, contradictory information, fabricated volume, and other disqualifying inconsistencies. Atlas' creation of inflated, inconsistent datasets, followed by its refusal to promptly provide the Lists to PCM, supports a strong inference of knowingly false conduct.  Taken collectively, the facts "give rise to a strong inference of scienter," satisfying Rule 9. *Caspersen*, 441 F. Supp. 3d at 39-40.

The intent-to-induce reliance element of fraud may be alleged generally and proven through circumstantial evidence. *Kaufman*, 165 N.J. at 109. Reliance is a state-of-mind element that *Fed. R. Civ. P.* 9 allows to be pled inferentially. *Id.* at 111 (reliance may be direct or indirect). PCM pled extensive facts (e.g., mass emails to sales inbox, volume, and timing of cyber-attack followed by obstruction) showing Atlas' intention that PCM rely on its false statements.

The totality of the allegations satisfies Rule 9 requirement to plead the "who, what, when, where, and how" of the fraud scheme. *Gross*, 434 F. Supp. 3d at 249. Atlas acted "with the intention that [the other party] rely on" the misstatements. *Kaufman*, 165 N.J. at 108.

### 3.    *PCM Reasonably Relied and Sustained Damages as a Result*

PCM reasonably relied on Atlas' misrepresentations and same caused substantial harm. Again, reliance may be direct or indirect. *Kaufman*, 165 N.J. at 109. Where misrepresentations are directed to induce action through third parties or fraud, as here, reliance is foreseeable and reasonable.

PCM's reliance was reasonable, it was forced to so rely by design. Atlas intentionally structured its conduct so that PCM could not distinguish fraudulent communications from legitimate requests. PCM acted reasonably, in accordance with established business practices, when it treated the avalanche of emails as requiring attention, investigation, and technological intervention. Whether reliance

is ultimately deemed reasonable is a question of fact. *Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 452, 458 (App. Div. 1985). PCM's reliance may be inferred at pleading by Atlas scheme designed to induce it.

Atlas' scheme relied on deceiving Assignors and PCM reasonably relied on same indirectly.[10] Atlas intended its misrepresentations to shape Assignors' decisions so Atlas could then weaponize those decisions against PCM. This is exactly the type of indirect reliance that satisfies fraud, the Assignors' reliance was both foreseeable and integral to Atlas' plan. *Varacallo*, 332 N.J. Super. at 50. The induced reliance served as the mechanism by which Atlas intended to deceive PCM – a classic form of indirect reliance recognized in *Kaufman*.

As detailed, PCM's reliance caused severe operational, financial, business and technological harm. PCM pled injuries that satisfy the damages element of fraud, for example disruption of use, expenditure of resources responding to the cyberattack, and the fallout of Atlas' intentional misconduct causing lost revenue, lost profits, and lost business. These are precisely the type of damages that satisfy the fraud element requiring harm "as a result of" reliance. *See Avaya Inc.*, 838 F.3d at 388.

### E.    PCM Sufficiently Pled a Claim for Relief for Civil Conspiracy

---

[10] Indirect reliance is established where false statements are made to one party intending the statements to reach and influence another. *Kaufman*, 165 N.J. at 111.

"In New Jersey, civil conspiracy[11] is a tort comprised of four elements: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 390 (D.N.J. 2016) (internal quotes/cite omitted). "[A] plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the exact limits of the illegal plan or the identity of all participants, as long as plaintiff alleges that each participant shared in the general conspiratorial objective." *MaxLite, Inc. v. ATG Elecs., Inc.*, No. CV 15-01116, 2024 WL 4764685, at *9 (D.N.J. Nov. 13, 2024) (internal quotes/cite omitted). Direct evidence is also not needed, only that the agreement "could be circumstantially inferred[.]" *Id.* (internal quotes/cite omitted). Civil conspiracy is not an independent tort; it is grounded in an underlying actionable wrong thereby requiring an overt act, which proximately causes damages. *Farris v. Cnty. of Camden*, 61 F. Supp. 2d 307, 330 (D.N.J. 1999). The focus is the underlying wrong, not the agreement itself. *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015). At the pleading stage, the nature of a conspiracy makes it impossible to provide the details. *Philip Morris USA, Inc. v. Lee*, 481 F. Supp. 2d 742, 747

---

[11]    Civil conspiracy claims are evaluated under Rule 8's general pleading standard. *Hillsborough Rare Coins, LLC v. ADT LLC*, No. CV 16-916 (MLC), 2017 WL 1731695, at *12 (D.N.J. May 2, 2017).

(W.D. Tex. 2006). Moreover, the identity of all co-conspirators is not required as same may be unveiled in discovery so long as the facts give rise to the inference of an agreement. *Freeman v. Giuliani*, No. CV 21-3354 (BAH), 2022 WL 16551323, at *11 (D.D.C. Oct. 31, 2022).

As detailed above, PCM alleged that Atlas acted in concert with others. It could not have launched its attack and accessed PCM's systems and data alone. It is easily inferred, particular giving all favorable inferences to PCM, that Atlas and others agreed to commit an unlawful act, i.e., the actions detailed in violation of CFAA, CROA, tortious interference, and fraud. They took overt acts, i.e., the spam attack, misrepresentations, obstruction of compliance, unauthorized access, and PCM suffered resulting damages. Atlas' motion must be denied.

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, PCM respectfully requests Atlas' motion to dismiss PCM's counterclaims be denied in its entirety.

Dated: February 3, 2026

**GREENSPOON MARDER LLP**

*/s/Kelly Purcaro*
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com
*Attorneys for Defendant Joy Rockwell Enterprises, Inc.*

39